# In the United States Court of Federal Claims

Nos. 19-1580, 19-1585 (consolidated)
Filed: February 20, 2020
Reissued: March 11, 2020[1]

| | | |
|---|---|---|
| FLUOR INTERCONTINENTAL, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | Post-Award Bid Protest; Judgment on |
| Defendant | ) | the Administrative Record; RCFC 52.1; |
| | ) | Motion to Dismiss; RCFC 12(b)(1); |
| and | ) | RCFC 12(b)(6); Tucker Act; |
| | ) | Jurisdiction; Multiple Award Task |
| KELLOGG, BROWN & ROOT | ) | Order Contract; Indefinite-Delivery |
| SERVICES, INC., | ) | Indefinite-Quantity Contract; Task |
| | ) | Order Contract; 10 U.S.C. § 2304d(1); |
| Defendant-Intervenor. | ) | Task Order; Firm-Fixed Price; |
| | ) | Cost-Plus-Fixed-Fee; Federal |
| | ) | Acquisition Streamlining Act; |
| FLUOR INTERCONTINENTAL, INC., | ) | Administrative Procedure Act; |
| | ) | Arbitrary and Capricious; Disparate |
| Plaintiff, | ) | Treatment; Technical/Management |
| | ) | Approach; Labor Staffing Model; Past |
| v. | ) | Performance; Price Reasonableness; |
| | ) | FAR 15.404-1(b); Value Analysis; |
| THE UNITED STATES, | ) | FAR 15.404-1(b)(4); Cost Realism; |
| | ) | FAR 15.404-1(d); Prejudice. |
| Defendant | ) | |
| | ) | |
| and | ) | |
| | ) | |
| VECTRUS SYSTEMS CORPORATION, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

*Andrew Emil Shipley*, Wilmer Cutler, et al., Washington, DC, for plaintiff.

---

[1] An unredacted version of this opinion was issued under seal on February 20, 2020. The parties were given an opportunity to propose redactions, but no such proposals were made.

*Igor Helman*, U.S. Department of Justice, Civil Division, Washington, DC, for defendant.

*Lee Paul Curtis*, Perkins Coie, Washington, DC, for defendant-intervenor, Kellogg, Brown & Root Services, Inc.  *Kevin Patrick Mullen*, Morrison & Foerster, LLP, Washington, DC, for defendant-intervenor, Vectrus Systems Corporation.

## OPINION AND ORDER

*SMITH*, Senior Judge

        The central purpose of federal procurement law is to ensure that competition for government contracts, which are funded by tax payer dollars, is fair to both the government and to contractors.  Only when competition is fair and open can the government get what it pays for, and can the contractor receive fair value for the work and goods it provides.  If the system is not fair, the tax payer will be cheated, and honest contractors will be unwilling to contract with the government.  Accordingly, procurement law is designed to insure against corruption of the process, be it through bribery, government favoritism, or poor management of the procurement processes.  The law in turn provides disappointed bidders with an avenue through which they can challenge arbitrary and irrational government decisions, where disappointed bidders effectively act as "private attorney generals," keeping the system under perpetual scrutiny, ferreting out mistakes, and bringing to light bad government practices that impact their chances of receiving contract awards.  This the creates an effective system by which disappointed bidders keep in check the natural human tendency to award contracts based on favoritism.  So far, the system has worked rather effectively, though of course, any effectively run system has its associated costs.  Congress has, however, decided that the cost of expensive bid protest litigation is less than the cost of a corrupt or irrational decision-making process dealing with tens of billions of dollars.  As such, the Court must understand the broad purposes behind procurement law to effectively handle procurement cases.  The close scrutiny of disappointed bidders is balanced out by the deference afforded to Agencies.  We must remember that it is the agencies that have the authority, bestowed upon them by Congress and the President, to manage the procurement system.  The Court's role is to ensure fair and rational review by the agency in following the law in its decision-making processes.

        In this case, as well as the other cases related to Request for Proposal No. W52P1J-16-R-0001 ("RFP" or "Solicitation"), the six offerors spent many months and a large amount of money developing their proposals.  In general, the evaluation process worked well.  However, perhaps as a result of the inherent subjectivity and discretion in government contracting, a number of procurement ambiguities led to this extensive and expensive litigation.  The weight afforded by the United States Department of the Army ("Agency" or "Army") to each of the four evaluation factors led to many of the alleged issues currently in dispute.  The Solicitation prescribed the following evaluation factors, listed in descending order of priority: (1) Technical/Management Approach; (2) Past Performance; (3) Small Business Participation; and (4) Cost/Price.  Administrative Record (hereinafter "AR") 2624.  The ultimate award decisions confirm what the Solicitation stated—that the Technical/Management Approach was not just the most important factor, but that it was overwhelmingly more important than the other three

factors. While the Agency's emphasis on the Technical/Management Approach was neither arbitrary nor capricious, the Court believes the uncertain level of priority afforded that factor played a significant role in each offeror's decision to litigate this procurement, as did, of course, the huge amount of money at stake.

A final point. This litigation involves contracts worth up to $82 billion for work to be performed over the next decade. While the Court detailed the reasons it has jurisdiction over these protests in *PAE-Parsons Global Logistics Services, LLC v. United States*, 145 Fed. Cl. 194 (2019), and in a later section of this Opinion, the Court finds that each of the protests related to this procurement concern disputes over the evaluation of offerors for the award of Indefinite-Delivery Indefinite-Quantity ("IDIQ") contracts, not disputes related to future task orders. To hold that this Court lacks jurisdiction over this massive IDIQ procurement would effectively gut a significant part of federal procurement law by using the Federal Acquisition Streamlining Act of 1994 ("FASA"), 10 U.S.C. § 2304c(e) (2018), to nullify a broad area of contract scrutiny. This misuse of FASA would not streamline the procurement and protest process, but, rather, would eliminate a significant part of it, directly contradicting the legislative intent behind both FASA and the Competition in Contracting Act.

This post-award bid protest comes before the Court on defendant's Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"), and on the parties' Cross-Motions for Judgment on the Administrative Record. Plaintiff, Fluor Intercontinental, Inc. ("Fluor"), challenges the decision by the Army to award IDIQ contracts to defendant-intervenors, Kellogg, Brown & Root Services, Inc. ("KBR") and Vectrus Systems Corporation ("Vectrus"). *See generally* Fluor Intercontinental, Inc.'s Motion for Judgment on the Administrative Record (hereinafter "Pl.'s MJAR").[2] The Solicitation sought to award Multiple Award Task Order Contracts for global logistic support services under the Army's fifth iteration of its Logistics Civil Augmentation Program ("LOGCAP"), or LOGCAP V. For the reasons set forth below, defendant's Motion to Dismiss is granted-in-part and denied-in-part, and plaintiff's Motion for Judgment on the Administrative Record is granted-in-part and denied-in-part. Defendant and defendant-intervenors' Cross-Motions for Judgment on the Administrative Record are granted-in-part and denied-in-part.

## I.     Background

On November 20, 2017, the Agency issued the LOGCAP V Solicitation, requesting proposals for "contracted capabilities to plan for and, when directed, rapidly provide the sustainment capabilities necessary to set theaters and enable Army and Joint, Interagency, Intergovernmental, and Multinational operations . . . and support theater operations." Administrative Record (hereinafter "AR") 2510, 2769. The Solicitation established an $82 billion maximum dollar amount across all contracts and contemplated a minimum of four and up to six IDIQ contract awards covering six Geographic Combatant Commands ("COCOMs") and Afghanistan. AR 2511–12. The Army was to conduct seven best value decisions and

---

[2]     As Case Nos. 19-1580, 19-1585 have been consolidated, citations to the parties' briefs or the docket refer to filings or docket entries under *Fluor Intercontinental, Inc. v. United States*, No. 19-1580, unless the Court indicates otherwise.

subsequently issue "basic IDIQ contract awards along with [the] simultaneous issuance of correlating task orders to the successful Offerors." AR 2511, 2623–24. Offerors "may only be awarded one basic IDIQ contract." AR 2610. The "base year of the setting the theater" requirement for each COCOM established the minimum dollar guarantee for each IDIQ contract. AR 2511–12, 2624. The Army anticipated issuing subsequent task orders to awardees during the performance period of each contract. AR 2512.

The Solicitation directed each offeror to submit a single, comprehensive proposal that the Agency would review to make "[b]asic IDIQ contract and initial task order award determinations . . . based on three operational priority groupings." AR 2610, 2624. Operational Priority Grouping 1 included the European Command ("EUCOM") and Pacific Command ("PACOM") COCOM regions. AR 2511, 2624. Operational Priority Grouping 2 included the Central Command ("CENTCOM"), Northern Command ("NORTHCOM"), African Command ("AFRICOM"), and Southern Command ("SOUTHCOM") regions. AR 2511, 2625. Operational Priority Grouping 3 exclusively covered the Afghanistan region. AR 2625. The Agency made its award decisions for each COCOM in descending order of priority to the offeror that provided the best value for that region, beginning with Priority Group 1 and concluding with Priority Group 3. AR 2624–25. Offerors could receive only one COCOM award in each Operational Priority Grouping (hereinafter "Priority Group"). AR 2625. Only a prior COCOM awardee could receive the Afghanistan region, though the CENTCOM awardee was ineligible for that region. *Id.*

The Agency evaluated offerors on a best value basis according to the following four factors, listed in descending order of importance: (1) Technical/Management; (2) Past Performance; (3) Small Business Participation; and (4) Cost/Price. AR 2624. The non-price factors, when combined, were "significantly more important than Cost/Price. Although Cost/Price is not the most important factor, it could become a controlling factor if offers under the non-price factors tend to equalize. The closer the ratings in the non-Cost/Price factors, the more significant Cost/Price becomes." *Id.* The Solicitation required that the Agency provide a narrative evaluation of offerors' proposals, a single adjectival under both the Past Performance and Small Business Participation Factors, and separate adjectival ratings for each COCOM and Afghanistan under the Technical/Management Factor. AR 2624–25.

Under the Technical/Management Factor, offerors proposals were broken into the following two components: (1) Regional Capabilities; and (2) Management Approach, Key Initiatives, and Labor Staffing Model ("LSM"). AR 2614. Under the first component, offerors were to complete a Regional Capability Matrix and corresponding description of their regional planning and performance capabilities for each of the six COCOMs, but not for Afghanistan. AR 2614–15. Under the second component, offerors had to address the following sub-components: (1) Management Approach; (2) Key Initiatives; (3) LSM and Approach; (4) LSM Supporting Rationale; and (5) Labor Job Descriptions. AR 2615–17. For their LSM and Approach, offerors had to submit a base LSM that "predicts" labor staffing mix, labor type, and labor quantities with "consistent, scalable, and adjustable accounting for all activated service requirements identified through the RFP, the [Performance Work Statement ('PWS')], and the associated technical exhibits." AR 2616. The Solicitation noted that any "resource information"

described in the offeror's Technical/Management proposal, such as job categories and labor hours, must be consistent and reflected in the offeror's Cost/Price proposal.  AR 2614.

In evaluating Past Performance, the Agency could consider the currency, relevancy, and context of the offerors' Past Performance information, as well as general trends of performance and demonstrated corrective actions.  AR 2628.  An offeror would receive the highest rating of "Substantial Confidence" when, based on the offeror's "recent/relevant performance record, the Government has a high expectation that the Offeror will successfully perform the required effort."  *Id.*  An offeror would receive a "Satisfactory Confidence" rating when "the Government has a reasonable expectation that the Offeror will successfully perform the required effort" based on the offeror's "recent/relevant performance record."  *Id.*

Under the Cost/Price Factor, the Solicitation directed offerors to submit discrete Cost/Price proposals for each of the COCOM and Afghanistan task orders.  AR 2620–21.  Specifically, offerors were to include a proposal for the Cost-Plus-Fixed-Fee ("CPFF") Contract Line Item Numbers ("CLINs") and a separate proposal for the Firm-Fixed-Price ("FFP") CLINs.  AR 2620–22; *see generally* AR 3810–30.  In assessing offerors' proposals, the Solicitation directed the Agency to perform cost realism and price reasonableness analyses using FAR Part 15 procedures as follows:

> The Government will evaluate the realism of the offeror[']s proposed cost for the cost reimbursable effort through cost realism analysis [in accordance with] [Federal Acquisition Regulation ("FAR")] 15.404-1(d).  The Government will evaluate price reasonableness for the fixed priced effort [in accordance with] FAR 15.404-1(b).  A total evaluated price [("TEP")] will be determined for each [COCOM] and Afghanistan award determination[].  The [TEP] for each award determination will be determined by adding together the offeror[']s proposed [CPFF] for the cost reimbursable efforts, any cost adjustments necessary based upon the cost realism analysis, and the offeror[']s proposed price for the [FFP] effort.

AR 2629.  The Solicitation also specified that for CPFF CLINs, "Offerors [sic] proposed costs will be evaluated for reasonableness and realism."  *Id.*  For FFP CLINs, "Offerors [sic] proposed price will be evaluated for reasonableness using price analysis techniques."  AR 2630.

On April 12, 2019, the Agency simultaneously awarded four separate IDIQ contracts and associated task order awards to Fluor, KBR, Vectrus, and PAE-Parsons Global Logistics Services, LLC ("P2GLS").  *See generally* AR 70712–47.  Specifically, Fluor received the AFRICOM award (Priority Group 2), KBR the EUCOM, NORTHCOM, and Afghanistan awards (Priority Groups 1, 2, and 3), Vectrus the PACOM and CENTCOM awards (Priority Groups 1 and 2), and P2GLS the SOUTHCOM award (Priority Group 2).  *See id.*  On May 1, 2019, Fluor filed protests with the Government Accountability Office ("GAO"), challenging the Agency's concurrent IDIQ and associated task order awards to KBR and Vectrus.  *See generally* GAO Advisory Opinion, ECF No. 35 (hereinafter "GAO Advisory Opinion").  Two days before Fluor would have received a decision in accordance with 4 C.F.R. § 21.9(a) (2019), DynCorp International LLC ("DynCorp") filed a directly related bid protest with this Court, and, as a

result, the GAO dismissed Fluor's protests as academic.  *See generally DynCorp Int'l LLC v. United States*, No. 19-1133; *see also* GAO Advisory Opinion at 9.  In response, on October 10, 2019, Fluor filed two complaints with this Court.  *See generally* Plaintiff's Complaint, *Fluor Intercontinental, Inc. v. United States*, No. 19-1580 (hereinafter "*Fluor I*"); Plaintiff's Complaint, *Fluor Intercontinental, Inc. v. United States*, No. 19-1585 (hereinafter "*Fluor II*").

On October 15, 2019, defendant filed unopposed motions requesting advisory opinions from the GAO.  *See generally* Defendant's Unopposed Motion for Judicial Request of an Advisory Opinion from the Government Accountability Office, *Fluor I*, ECF No. 13; Defendant's Unopposed Motion for Judicial Request of an Advisory Opinion from the Government Accountability Office, *Fluor II*, ECF No. 14.  That same day, the Court consolidated plaintiff's cases due to their factual and legal commonalities.  *See generally* Order Consolidating Case, *Fluor I*, ECF No. 15; Order Consolidating Case, *Fluor II*, ECF No. 16.  On October 16, 2019, the Court granted defendant's Motions under the consolidated matter.  *See generally* Order, *Fluor I*, ECF No. 18.  On November 5, 2019, the Court received the GAO's Advisory Opinion, in which the GAO held that it "would have objected to the agency's price reasonableness evaluation for the EUCOM task order, but otherwise would have found no other basis to object to the agency's actions for the reasons advanced in Fluor's earlier [GAO] protests."  GAO Advisory Opinion at 38.

On October 29, 2019, plaintiff filed its Motion for Judgment on the Administrative Record.  *See generally* Pl.'s MJAR.  On November 8, 2019, defendant filed its Motion to Dismiss, Cross-Motion for Judgment on the Administrative Record, and Response.  *See generally* Defendant's Motion to Dismiss, Cross-Motion for Judgment on the Administrative Record and Opposition to Plaintiff's Motion for Judgment on the Administrative Record (hereinafter "Def.'s CMJAR").  Defendant-intervenors filed their respective Cross-Motions for Judgment on the Administrative Record and Responses that same day.  *See generally* Vectrus's Cross-Motion for Judgment on the Administrative Record and Response in Opposition to Fluor's Motion for Judgment on the Administrative Record (hereinafter "Vectrus's CMJAR"); Kellogg, Brown & Root Services, Inc.'s Cross-Motion for Judgment on the Administrative Record (hereinafter "KBR's CMJAR").  On November 12, 2019, plaintiff filed its Response and Reply.  *See generally* Plaintiff Fluor Intercontinental, Inc.'s Reply in Support of Motion for Judgment on the Administrative Record and Responses to Motions to Dismiss and Cross-Motions on Administrative Record (hereinafter "Pl.'s Resp.").  Defendant and defendant-intervenors filed their respective Replies on November 15, 2019.  *See generally* Defendant's Reply in Support of its Motion to Dismiss and Cross-Motion for Judgment on the Administrative Record (hereinafter "Def.'s Reply"); Vectrus's Reply to Fluor's Response (hereinafter "Vectrus's Reply"); Kellogg, Brown & Root Services, Inc.'s Reply in Support of Its Cross-Motion for Judgment on the Administrative Record (hereinafter "KBR's Reply").  The Court held oral argument on November 18, 2019.  The parties' Motions are fully briefed and ripe for review.

## II.      Standard of Review

This Court's jurisdictional grant is found primarily in the Tucker Act, which gives the Court the power "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency . . . or to a proposed award or the award of a contract or any

alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2018).  In a bid protest, this Court "may award any relief that the court considers proper, including declaratory and injunctive relief." § 1491(b)(2).

Whether a plaintiff has standing to pursue its claim is a "threshold jurisdictional issue." *Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–04 (1998)).  Standing in bid protests is framed by 28 U.S.C. § 1491(b)(1), which requires that the bid protest be brought by an "interested party."  A protestor is an "interested party" if it is an actual or prospective bidder "whose direct economic interest would be affected by the award of the contract."  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (citing *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)).

## A.  Motion to Dismiss

When considering a motion to dismiss under RCFC 12(b)(1) or 12(b)(6), the Court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011); *see also Brizuela v. United States*, 492 F. App'x 97, 98–99 (Fed. Cir. 2012).  The plaintiff bears the burden of establishing this Court has jurisdiction by a preponderance of the evidence.  *Diaz v. United States*, 853 F.3d 1355, 1357 (Fed. Cir. 2017); *see IHS Global, Inc. v. United States*, 106 Fed. Cl. 734, 743 (2012).  Where "a motion to dismiss challenges the jurisdictional facts alleged in the complaint, the court may consider evidence beyond the pleadings to resolve the dispute." *Hughes Grp., LLC v. United States*, 119 Fed. Cl. 221, 224 (2014) (citing *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)).

## B.  Motion for Judgment on the Administrative Record

Pursuant to RCFC 52.1, a party may file a motion for judgment on the administrative record to request that the Court determine whether an administrative body, given all disputed and undisputed facts in the record, acted in compliance with the legal standards governing the decision under review.  *See Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 382 (2013) (citing *Fort Carson Supp. Servs. v. United States*, 71 Fed. Cl. 571, 585 (2006)).  On such a motion, the parties are limited to the Administrative Record, and the Court must make findings of fact as if it were conducting a trial on a paper record.  RCFC 52.1; *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354 (Fed. Cir. 2005).  The Court will then determine whether a party has met its burden of proof based on the evidence in the record.  *Bannum*, 404 F.3d at 1355.

This Court reviews bid protests in accordance with the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2018).  *Axiom Res. Mgmt. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  Agency procurement actions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706 (2018) (incorporated in 28 U.S.C. § 1491(b)(4)).  That highly deferential standard exists in part because agencies and their "[c]ontracting officers are

'entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.'" *See Savantage Fin. Servs. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (quoting *Impresa*, 238 F.3d at 1332); *see also Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).

To succeed on a claim that an agency's decision violates a statute, regulation, or procedure, the protestor must show that such alleged violation was "clear and prejudicial." *Impresa*, 238 F.3d at 1333. In reviewing a protestor's claims, the Court cannot substitute its judgment for that of an agency, even if reasonable minds could reach differing conclusions. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974); *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (Where the Court "finds a reasonable basis for [an] agency's action, the [C]ourt should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."). Accordingly, the Court will "interfere with the government procurement process 'only in extremely limited circumstances.'" *EP Prods., Inc. v. United States*, 63 Fed. Cl. 220, 223 (2005) (quoting *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983)).

## III.    Discussion

In its Motion for Judgment on the Administrative Record, plaintiff claims the Agency acted arbitrarily and capriciously in doing the following: (1) evaluating each of Fluor, KBR, and Vectrus's Regional Capability Matrices separately from their respective Technical/Management proposals; (2) failing to evaluate offerors' narrative descriptions of their regional planning and performance capabilities under the Technical/Management Factor; (3) double-counting and overvaluing a strength in Vectrus's Technical/Management evaluation; (4) inexplicably increasing KBR and Vectrus's Technical/Management ratings in certain COCOMs, while decreasing the Technical/Management rating assigned to Fluor; (5) disparately evaluating Fluor, KBR, and Vectrus's Past Performance proposals; (6) failing to conduct the price reasonableness analysis for the EUCOM region as required by the Solicitation; and (7) failing to conduct a meaningful cost realism analysis of Vectrus's CENTOM proposal. *See* Pl.'s MJAR at 2–4.

In its Response, defendant argues that this Court lacks jurisdiction over plaintiff's Complaints pursuant to the jurisdictional bar under FASA, 10 U.S.C. § 2304c(e), and because plaintiff, as an awardee, lacks standing as an interested party. Def.'s CMJAR at 15–16. Alternatively, defendant requests that the Court grant its Cross-Motion for Judgment on the Administrative Record as the Agency's evaluation and resulting award decisions were rational, and because plaintiff's arguments merely reflect a disagreement with the Agency's judgment. *See generally* Def.'s CMJAR.

### A.  Jurisdiction

FASA limits this Court's jurisdiction by excepting from it protests that are "in connection with the issuance or proposed issuance of a task or delivery order except for . . . a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued." 10 U.S.C. § 2304c(e). Since the enactment of FASA, this Court has

extended the jurisdictional bar to include claims made in connection with task order modifications as well as corrective action that "relates to, and is connected with, the issuance of a task order." *Akira Techs., Inc. v. United States*, 145 Fed. Cl. 101, 108 (2019); *Mission Essential Pers., LLC v. United States*, 104 Fed. Cl. 170, 179 (2014); *see also Nexagen Networks, Inc. v. United States*, 124 Fed. Cl. 645, 653 (2015).

Consistent with the award scheme contemplated by the Solicitation, the Agency ultimately awarded four Multiple Award Task Order Contracts. *See, e.g.*, AR 289048. Pursuant to 10 U.S.C. § 2304d(1) (2018), a "task order contract" is defined as "a contract for services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of the contract." FAR 16.501-2(a) provides that, "[p]ursuant to 10 U.S.C. 2304d and 41 U.S.C. 4101, requirements contracts and indefinite-quantity contracts are also known as delivery-order contracts or task-order contracts." Accordingly, based on FAR Part 16.5, a task order contract "may take the form of . . . indefinite-quantity (IDIQ) contracts." JOHN CIBINIC, JR., RALPH C. NASH JR. & CHRISTOPHER R. YUKINS, FORMATION OF GOVERNMENT CONTRACTS 327 (4th ed. 2011). Per FAR 52.216-27, these types of contracts may either be single award or multiple award contracts,[3] such as the Multiple Award Task Order Contracts at issue in this procurement. As this Court has jurisdiction over the "award of a contract or any alleged violation of statute or regulation in connection with a procurement" pursuant to the Tucker Act, and in light of this Court's routine exercise of jurisdiction over protests contesting an agency's award of an IDIQ contract, the Court must determine whether the FASA jurisdictional bar applies to the case at bar in accordance with 10 U.S.C. § 2304d(1) and 10 U.S.C. § 2304c(e). *See* 28 U.S.C. § 1491(b)(1); *see, e.g.*, *Tele-Consultants, Inc. v. United States*, 142 Fed. Cl. 686 (2019) (resolving a protest challenging an agency's IDIQ contract awards); *see also Weeks Marine*, 575 F.3d at 1359–60, 1362 (acknowledging that the Tucker Act confers on this Court jurisdiction over bid protests concerning Multiple Award Task Order Contracts). As more fully explained below, upon careful review of the Administrative Record, the full text of 10 U.S.C. § 2304c, and the legislative intent behind FASA, the Court concludes that the FASA bar does not apply.

In its Motion to Dismiss, defendant alleges that plaintiff's protest is barred by FASA and should therefore be dismissed for lack of subject-matter jurisdiction, as plaintiff "is effectively challenging the award of task orders for EUCOM and Afghanistan to KBR, and the award of task orders for PACOM and CENTCOM to Vectrus." Def.'s CMJAR at 15 (citations omitted). For the Afghanistan region specifically, defendant claims that, "because no IDIQ contract would be awarded based upon the Afghanistan best-value determination, the award for Afghanistan was a pure task-order competition, which is distinguishable from this Court's earlier decision in *PAE-Parsons Global Logistics Services, LLC v. United States*, 145 Fed. Cl. 194 (2019)." Def.'s Reply at 12–13. Alternatively, defendant argues that if the FASA bar does not

---

[3]     FAR 52.216-27, titled Single or Multiple Awards, provides the following:

The Government may elect to award a single delivery order contract or task order contract or to award multiple delivery order contracts or task order contracts for the same or similar supplies or services to two or more sources under this solicitation.

apply, "then the Court should still dismiss Fluor's complaint because, as a fellow LOGCAP V IDIQ contract awardee, Fluor is not an 'interested party.'"  Def.'s CMJAR at 16.

Congress specifically tailored FASA to ensure that its "objectives would be accomplished without undermining the key features of the current procurement statutes, such as full and open competition and an effective bid protest process, that have been established over the years to safeguard the acquisition system and prevent abuse."  S. REP. NO. 103-258, at 3 (1994) (emphasis added).  Anticipating that agencies might attempt to abuse FASA's jurisdictional bar, Congress further cautioned that task order contracts "must be structured carefully to ensure that they are not abused to avoid competition and funnel money to favored contractors."  140 CONG. REC. 12369 (1994) (emphasis added).  Accordingly, the courts have interpreted FASA to mean that "once the task or delivery order contract itself has been obtained through full and open competition, orders made pursuant to that contract are immune from [the Competition in Contracting Act]'s full and open competition requirement."  *Glob. Comput. Enter. v. United States*, 88 Fed. Cl. 350, 414 (2009) (quoting *Corel Corp. v. United States*, 165 F. Supp. 2d 12, 16 (D.D.C. 2001)).  That interpretation and the Court's conclusion that task order contracts are different from pure task orders is bolstered by the language of 10 U.S.C. § 2304c(a), which semantically crystalizes the distinction between a task order contract and a task order awarded under that contract as follows: "[t]he following actions are not required for issuance of a task or delivery order *under a task or delivery order contract*."  (emphasis added).  Moreover, § 2304c(e)—the FASA bar—specifically focuses on task orders as opposed to task order contracts, as it states that "[a] protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for . . ."  (emphasis added).  Thus, to allow the Agency to entirely avoid judicial review of its contract awards by intentionally linking the task order awards to the task order contracts at issue would directly violate the distinctions drawn in 10 U.S.C. § 2304a between task order contracts and task order awards as well as Congress's clearly documented intent to prevent such a result from occurring.  See, e.g., 140 CONG. REC. 12369 (1994).

As the Court previously held in *PAE-Parsons*, the FASA bar does not apply to this procurement.  145 Fed. Cl. at 199.  The IDIQ contract and the "orders made pursuant to that contract" were obtained through the exact same procurement vessel.  AR 2624 ("The Government will conduct seven best value decisions as described below and all awards will be made concurrently."); *see also Glob. Comput.*, 88 Fed. Cl. at 414.  If the Court were to extend the FASA bar to this procurement simply because the IDIQ contract and the task orders were simultaneously awarded, it would effectively be "undermining the key features of the current procurement statutes, such as full and open competition," in direct contravention of the legislative intent behind FASA.  *See* S. REP. NO. 103-258, at 3.  Such an application of FASA would create a loophole in which an agency could award underlying IDIQ contracts that were judicially impregnable, effectively obliterating the requirement that contracts be awarded through free and open competition and breeding agency abuse of procurement law and regulation.

Moreover, it is well-established law that the Court "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions."  *See, e.g.*, *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1353 (Fed.

Cir. 2004) (citing *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003)). The Solicitation stipulated that the Agency would award a minimum of four and up to six IDIQ contract awards that cover the six COCOMs and Afghanistan. AR 2511–12. The Agency deliberately made award determinations for each of the COCOM regions in descending order of priority, beginning with EUCOM and ending with SOUTHCOM. *See* AR 2624–25. As such, the six COCOMs could have been awarded to six *different* offerors through six *different* IDIQ contracts, each with a different minimum dollar guarantee. *See* AR 2511–12. Therefore, each COCOM "task order" could have been an offeror's first IDIQ contract award. Such a scheme clearly indicates both that the IDIQ awards were so intrinsically linked with the task order awards as to be practicably a single award, and that the Agency functionally issued *separate and distinctly different* IDIQ contract awards. To find otherwise would permit agencies to functionally award unreviewable base IDIQ contracts by disguising them as follow-on task orders.

The Court's conclusion is further bolstered by the language of the Solicitation itself, which dictates that the "minimum guarantee for each LOGCAP V contract is the *base year of the setting the theater requirement . . .* [for] *each [COCOM]*." AR 2512 (emphases added). As the setting the theater task orders provide the *entire* value for the IDIQ contracts, AR 2512, 2624, bifurcating the task orders from the contracts would result in contracts with no consideration. As a contract cannot exist without consideration, and as the value of the setting the theater task orders provide the *only* consideration for the contracts at issue, clearly the initial task orders and the contracts are one and the same based on the Agency's deliberate award scheme. *See Bank of Guam v. United States*, 578 F.3d 1318, 1326 (Fed. Cir. 2009) (quoting *Trauma Servs. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997)) ("A party alleging either an express or implied-in-fact contract with the government 'must show a mutual intent to contract including an offer, an acceptance, and consideration.'"); *see also* AR 2512. Therefore, any offeror protesting the outcome of this procurement is necessarily protesting the contract itself, not simply a task order. Accordingly, the Court has jurisdiction over plaintiff's challenges to the Agency's Multiple Award Task Order Contract awards. *See* 28 U.S.C. § 1491(b)(1); *see also Weeks Marine*, 575 F.3d at 1359–60, 1362.

However, it also seems clear to the Court that, as offerors *must* receive an earlier IDIQ contract and associated task order award to be eligible for an Afghanistan award, and as the Afghanistan region does not have a setting the theater requirement, any Afghanistan award is necessarily the type of task order award that FASA explicitly bars the Court from reviewing. 10 U.S.C. § 2304c(e); *see also* AR 2625. Moreover, the Solicitation stipulated that the Agency would award a minimum of four and up to six IDIQ contract awards that cover six COCOMs and Afghanistan. AR 2511–12. Based on the award schema articulated in the Solicitation, it is not mathematically possible for the Afghanistan region award to be anything other than a task order award. *See* AR 2511–12, 2625. Accordingly, and pursuant to RCFC 12(b)(1), the Court hereby dismisses all of plaintiff's arguments concerning the Afghanistan region award for lack of subject-matter jurisdiction.

In response to defendant's standing arguments, plaintiff points to the Court's earlier decision in *PAE-Parsons*, in which the Court held that IDIQ awardees have standing to bring a protest under the specific circumstances surrounding this procurement. 145 Fed. Cl. at 200; Pl.'s

MJAR at 28–29.  As this Court has previously held, "status as a contract awardee does not by itself deprive this court of bid protest jurisdiction."  *Nat'l Air Cargo Grp., Inc. v. United States*, 126 Fed. Cl. 281, 295 (2016); *cf. Sys. Appl. & Techs. Inc. v. United States*, 691 F.3d, 1374, 1381–82.  In fact, "a protestor that won an IDIQ contract had standing to challenge the government's award of another IDIQ contract under the same solicitation to [a] different offeror."  *Nat'l Air Cargo Grp.*, 126 Fed. Cl. at 296 (citing *Glenn Def. Marine (Asia) PTE, Ltd. v. United States*, 97 Fed. Cl. 311, 317 n.3 (2011), *appeal on other grounds dismissed as moot*, 469 F. App'x 865 (Fed. Cir. 2012)).  Essentially, an awardee retains its "economic interest" in "stopping the government from stepping outside stated procurement terms in making further awards."  *Id.* at 294 (citing *Magnum Opus Techs., Inc. v. United States*, 94 Fed Cl. 512, 530 (2010)).  Based on this procurement's particularly unique and sequential award scheme, plaintiff's direct economic interest is clearly affected by the Agency's decision to award more valuable IDIQ contracts to other offerors prior to awarding the AFRICOM region to plaintiff.  Accordingly, plaintiff has adequately demonstrated that it is an interested party for purposes of standing.

## B.  Technical/Management Approach

Plaintiff claims that the Agency's evaluation of offerors' proposals under the Technical/Management Factor was flawed in three distinct ways.  First, plaintiff alleges the Agency "improperly jettisoned Fluor[], KBR[], and Vectrus'[s] Regional Capability Matrices from its evaluation and adopted instead a cookie-cutter approach that incorrectly leveled their Technical/Management volumes."  Pl.'s MJAR at 5 (capitalization omitted).  Second, plaintiff contends the Agency "improperly double-counted and overvalued a strength in Vectrus'[s] Technical/Management volume."  *Id.* at 14 (capitalization omitted).  Last, plaintiff claims the Agency "engaged in an unsubstantiated, across-the-board elevation of KBR[] and Vectrus'[s] Technical/Management ratings at the expense of Fluor."  *Id.* at 15 (capitalization omitted).  The Court will address these contentions in turn.

### 1.  Regional Capability Matrices and Narrative Descriptions

Plaintiff's first argument is dual-faceted.  First, plaintiff alleges that the Agency erroneously failed to individually review offerors' Regional Capability Matrices and narratives descriptions.  *See id.* at 5–11.  Plaintiff also posits that the Agency's error in not conducting this individuated assessment was compounded by the Agency's failure to meaningfully evaluate the narrative descriptions of each offeror's Regional Planning and Performance Capabilities.  *See id.* at 11–14.  In support of the former, plaintiff argues that the Solicitation makes "clear that the Regional Capability Matrix and the narrative description were to be individually considered." *Id.* at 5.  The Solicitation provides the following:

The evaluation will consider the Offeror[']s experience and capabilities within each [COCOM] as demonstrated in its Regional Capability Matrix (Attachment 21), as well as, the Offeror[']s description of its structure within each region to include, but not [be] limited to: internal locations and capabilities; established business arrangements with host countries; strategic partnerships, vendor networks, supply

chains; and anything else that demonstrates its rapid responsiveness, flexibility, capabilities, and/or experience throughout the [COCOM].

AR 2626.  Plaintiff argues that the Agency ignored this direction, and instead conflated offerors' Regional Capability Matrix submissions with their narrative descriptions, yet relied solely on the latter when assigning offerors strengths.  Pl.'s MJAR at 6.  Plaintiff claims that the absence of any mention of the Regional Capability Matrix in the Source Selection Evaluation Board ("SSEB") Evaluation Report, the Source Selection Advisory Council ("SSAC") Comparative Analysis Report, or the Source Selection Decision Document ("SSDD") further supports this conclusion.  Id. at 7.

To complete the Regional Capability Matrices, offerors had to mark an "X" for activities "directly related to LOGCAP services executed under existing or previous Government or commercial activity," and an "O" where the offeror had "been contracted, either by the US government or other activity[,] to provide this service but had yet to execute this requirement." AR 3838–59.  Any boxes left blank presumably meant the offeror had never previously executed or been contracted to perform that activity.  Based on these instructions, Fluor submitted a EUCOM proposal with hundreds of additional "X's" and "O's" as compared to KBR's EUCOM proposal, and PACOM and CENTCOM proposals with significantly more X's and O's than Vectrus's PACOM and CENTOM proposals, respectively.  Pl.'s MJAR at 8–9 (citing AR 9112–16, 18276–78, 18279–82, 18287–89, 55704–13, 55734–43).  Given the stark differences among the offerors' experience, plaintiff alleges that, had the Agency properly evaluated offerors' Regional Capability Matrices, the Agency "would have arrived at different best value determinations that favored Fluor."  Id. at 7.

Plaintiff further argues that, instead of meaningfully considering offerors' narrative descriptions, the Agency employed "a cookie-cutter approach in which it adopted the same conclusory rationale, and even the very same wording, in evaluating this required element of the proposal for each and every offeror for each and every [COCOM]."  Id. at 12.  Based on these alleged errors, plaintiff claims it was irrational for the Agency to conclude there were no appreciable differences between offerors, assign all three offerors five strengths and an "Outstanding" rating, or find Fluor's Technical/Management volume for EUCOM "comparable to KBR's," and its Technical/Management volumes for PACOM and CENTOM "comparable to Vectrus'[s]."  Id. at 8–10 (quoting AR 70330, 70338) (citing AR 70617, 70620–21, 70624).

In response, defendant contends that the Solicitation "indicated that the Army would consider each offeror's Regional Capability Matrix in conjunction with its narrative description," and explained that the evaluators cross-referenced each offeror's Regional Capability Matrix "to ensure that the matrix supported the narrative description."  Def.'s CMJAR at 18–19.  Thus, defendant argues that plaintiff is essentially asking the Court to engage in a simple counting exercise, even though "the mere fact that Fluor checked a greater number of the 3,000 possible boxes does not mean that its experience and capabilities are superior to KBR's in EUCOM, or to Vectrus's in PACOM or CENTCOM."  Id. at 19–20.  Additionally, Vectrus argues that the rationality of the Agency's conclusion is supported by the Solicitation, which states that the Agency would place emphasis on an "Offeror's ability to demonstrate *how* it will leverage its experience and capabilities."  Vectrus's CMJAR at 3 (emphasis in original) (citing AR 2626).

13

Last, defendant asserts that plaintiff's "cookie-cutter" argument is "belied" by the Administrative Record, as the SSAC describes, discusses, and compares each offeror's Regional Capabilities to the offeror's LSM.  Def.'s CMJAR at 20–21.  Specifically, defendant explains that the offerors' proposals "for Management Approach, Key Initiatives[,] and [LSM] were common to all [COCOMS] and only differed in the area of Regional Capabilities.  Accordingly, any Strengths, Weaknesses, Significant Weaknesses[,] or Deficiencies assigned for any criteria other than Regional Capabilities would be exactly the same for all the [COCOMs]."  *Id.* at 21 (citations omitted) (citing AR 2614–17, 2626–27).

The wide discretion this Court affords to contracting officers ("COs") "extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals."  *Caddell Constr. Co. v. United States*, 111 Fed. Cl. 49, 82 (2013).  Moreover, the Federal Circuit has made clear that challenges concerning "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess."  *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *Textron, Inc. v. United States*, 74 Fed. Cl. 277, 286 (2006).

Though the Agency could have employed a less mechanical approach in evaluating offerors' Technical/Management volumes, the Court cannot conclude that the Agency's Technical/Management ratings were arbitrary or capricious based on the underlying record.  The record reflects that the Agency both analyzed each offeror's Regional Capability Matrices and corresponding narrative descriptions, and that the Agency adequately documented its review thereof.  As offerors were required to demonstrate how they would leverage their experience and capabilities, AR 2626, it was rational for the Agency to assess offerors' Regional Capability Matrices in connection with their narrative descriptions.  Moreover, it was not unreasonable for the Agency to reference its EUCOM evaluations in the other COCOMs for Management Approach, Key Initiatives, and LSM, as the SSAC thoroughly discussed, tracked, and analyzed the differences across each offeror's Regional Capabilities in all six COCOM regions and Afghanistan.  *See generally* AR 70356–447.  Thus, the Court finds it was neither arbitrary nor capricious for the Agency to assign five strengths to each offeror's proposal or to conclude that Fluor's Technical/Management volume was "comparable to" those of KBR and Vectrus.  *See Caddell Constr.*, 111 Fed. Cl. at 82.

## 2. Regional Capabilities

Plaintiff's second protest ground focuses on the Agency's allegedly improper assignment of "the same five strengths for regional capabilities in PACOM and CENTCOM" to Fluor and Vectrus for each offeror's "Existing Internal Locations and Capabilities" and "Strategic Partnerships and Vendor Networks."  Pl.'s MJAR at 14.  In evaluating Vectrus's proposal, plaintiff claims the Agency failed to maintain the distinction between "internal" and "external," and consequently double-counted and overvalued a strength in Vectrus's Technical/Management volume.  *Id.*  Specifically, plaintiff alleges the Agency "irrationally characterized" Vectrus's team of subcontractors as part of Vectrus's "*internal* locations and capabilities" when assigning a strength, which plaintiff claims is problematic as the Agency cited those same resources when

14

assigning Vectrus a second strength for its "Strategic Partnerships and Vendor Networks." *Id.* at 15 (emphasis in original).

In response, defendant asserts that the Solicitation "did not instruct or notify offerors that existing locations and capabilities (or internal locations and capabilities) were limited to an offeror's in-house locations and capabilities[,] and allowed the use of teaming arrangements." Def.'s CMJAR at 23. Rather, as defendant-intervenor explains, the Solicitation "repeatedly emphasizes that the Agency will evaluate the prime offerors and their major subcontractors as part of the evaluation process, and make award to the contractor/team that represents best value." Vectrus's CMJAR at 8. For example, Section M.8.4 of the Solicitation dictates that the Agency's evaluation "will consider the Offeror[']s description of its structure within each region to include, but not [be] limited to: *internal* locations and capabilities; established business arrangements with host countries; strategic partnerships, vendor networks, supply chains; and anything else that demonstrates its rapid responsiveness, flexibility, capabilities, and/or experience throughout the [COCOM]." AR 2626 (emphasis added). Vectrus points out that Section M.8.4 only utilizes "internal" once, and that the corresponding text in Section L—the instruction portion of the Solicitation—contains the same requirements as those in Section M except for the term "internal." Vectrus's CMJAR at 7–9 (citing AR 2615). Furthermore, by virtue of permitting teaming arrangements, Vectrus claims the Solicitation "considered a prime offeror and its subcontractors both to be 'internal' where they, together, formed the LOGCAP V team for a particular region." *Id.* at 8–9. Last, even if Vectrus received two strengths, Vectrus states that Existing Internal Locations and Capabilities "focuses on a contractor's presence and capabilities in LOGCAP areas of operations," whereas Strategic Partnerships and Vendor Networks "focuses on a contractor's access to resources, such as specific supplies and services." *Id.* at 10 (citing AR 70366, 70384).

The Court agrees with defendant and defendant-intervenor's collective interpretation of the Solicitation. The Court previously explained that it "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." *See, e.g.*, *Banknote Corp.*, 365 F.3d at 1353. Due to the absence of any instruction in the Solicitation that would cabin the Agency's review of an offeror's "Existing Internal Locations and Capabilities" to the offeror's "internal" capabilities, or an offeror's "Strategic Partnerships and Vendor Networks" to its "external" capabilities, the Court concludes that the Agency's interpretation and resulting evaluation were reasonable. *See Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 743 (2008) (finding that, where the solicitation "d[id] not prohibit [the agency] from considering the capabilities or experience of subcontractors," the agency "was entitled to evaluate the ability of an offeror's subcontractors to perform work.").

Moreover, the Solicitation repeatedly addressed various ways in which the Agency would review an offeror's teaming arrangement and subcontractors, and even stated how the Agency would review the past performance of each offeror's proposed major or critical subcontractors. *See* AR 2613, 2618–19, 2627. As the Court "must interpret the Solicitation in context, and in a manner which gives effect to all of its terms," it cannot conclude that either the Agency's evaluation methods or assignment of strengths was unreasonable. *See Pac. Helicopter Tours, Inc. v. United States*, No. 06-613, 2007 U.S. Claims LEXIS 498, at *60 (Fed. Cl. Jan. 12, 2007). This is particularly true given the degree of discretion that courts afford COs in their evaluation

and rating of offerors' technical proposals. *See E.W. Bliss*, 77 F.3d at 449; *see also Caddell*, 111 Fed. Cl. at 82.

### 3. Changes in Ratings

Finally, plaintiff contends that the Agency's "last-minute changes" prejudiced Fluor where, without explanation, the Agency decreased Fluor's Technical/Management rating in Afghanistan,[4] increased KBR's rating in EUCOM, ascribed Vectrus five new strengths, and increased Vectrus's ratings in PACOM and CENTCOM. *See* Pl.'s MJAR at 15–17. Specifically, plaintiff argues that the Agency issued the second and final set of interim ratings after discussions closed, and that "the record is devoid of any substantiating documentation to support" the Agency's ultimate changes to those offerors' ratings and strengths save for a "conclusory uninformative remark" in all six COCOMs. *See id.* at 18–20. The Agency's alleged "conclusory uninformative remark" is as follows: "[t]he change in rating between the final rating and the earlier ratings is based on the team thoroughly considering the substantive merits of the offeror's proposal and recognizing that the merits of the proposal more appropriately reflect an Outstanding rating in accordance with the adjectival definitions." *See, e.g.*, AR 70120. Last, plaintiff claims that KBR's contention that its Evaluation Notice ("EN") responses caused the Agency to increase its Technical/Management rating fails, as the Agency knew and understood all EN responses when assigning the first interim ratings, and because discussions closed prior to the Agency's final set of interim ratings. Pl.'s Resp. at 19–20.

In response, defendant argues that the "contemporaneous edits to the evaluation report explain that the evaluators had completed a thorough review of all the merits of the offerors' proposals and compared them to the adjectival definitions in the solicitation, resulting in the changed adjectival ratings." Def.'s CMJAR at 24. Defendant further claims that, contrary to plaintiff's argument, the report subsequently contains "nearly one hundred pages providing explanations, reasons, and rationales for all the Army's ratings." *Id.* As to KBR's change in rating, KBR argues that it received an EN after submitting its second interim proposal, and that the evaluators did not include KBR's response to the underlying issue when assigning the final set of interim ratings. KBR's CMJAR at 20–21; KBR's Reply at 16. Last, defendant and defendant-intervenors maintain that "the difference between an offeror's interim and final adjectival ratings are irrelevant" where, like here, the Source Selection Authority ("SSA") makes a reasoned best-value analysis and source-selection decision. Vectrus's CMJAR at 13; *see* Def.'s CMJAR at 25 n.4; *see also* KBR's CMJAR at 23–24.

This Court has previously held that "an agency has the right to change its mind in the course of an evaluation if it has good reason." *Vanguard Recovery Assistance v. United States*, 101 Fed. Cl. 765, 786 (2011). Where an agency "requests [for] offerors to submit revised proposals, it may reevaluate those proposals and modify an offeror's strengths and weaknesses." *NVE, Inc. v. United States*, 121 Fed. Cl. 169, 182 (2015) (citing *Atl. Driving Supply, Inc. v. United States*, 107 Fed. Cl. 244, 261 (2012)). The "mere fact than an offeror's scores changed

---

[4]     As stated above, the Court does not address plaintiff's claims focused on the Agency's evaluation and subsequent task order award in the Afghanistan region for lack of subject-matter jurisdiction.

upon reevaluation," however, "does not mean an offeror was treated unfairly." *Id.* Moreover, challenges concerning "the minutiae of the procurement process in such matters as technical ratings and the timing of various steps in the procurement . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss*, 77 F.3d at 449. As such, an agency's "assignment of technical ratings is a matter that is within the broad discretion of the procuring agency, and this court will not intrude into that area in the absence of truly irrational conduct on the part of the agency." *FirstLine Transp. Sec., Inc. v. United States*, 100 Fed. Cl. 359, 397 (2011) (citing, *e.g.*, *E.W. Bliss*, 77 F.3d at 449).

The record before the Court indicates that the Agency's decision to increase KBR's Technical/Management rating from Good to Outstanding was rational, and that the Agency did not merely provide a bare and repetitive "conclusory uninformative remark" for its decision to change the offerors' respective ratings. *See generally* AR 70081–175. For instance, the impetus for KBR's change in rating appears to be, at least in part, due to KBR's resolution of an EN addressing a weakness. *See* AR 68411. While defendant and Vectrus both fail to indicate where in the Administrative Record the Agency resolved Vectrus's various issues, the Court's thorough review of the record revealed that the Agency adequately documented Vectrus's resolution of underlying deficiencies and weaknesses in assigning Vectrus its overall Technical/Management rating. *Compare* AR 267014, *and* 267031–32, *with* AR 68602; *see also* AR 68603–04, 68542–78. Based on the Agency's responses to Vectrus's final ENs, as well as the analyses in the SSEB Evaluation Report, SSAC Comparative Analysis Report, and the Agency's Final Technical/Management Evaluation Report, the Court concludes that the Agency acted rationally in awarding Vectrus five additional strengths and in increasing Vectrus's Technical/Management ratings in PACOM and CENTCOM.

## C.  Past Performance

In addition to its Technical/Management arguments, plaintiff claims the Agency disparately evaluated Fluor, KBR, and Vectrus's Past Performance proposals. Pl.'s MJAR at 18. Specifically, plaintiff alleges the Agency "brushed aside serious systemic problems" in KBR and Vectrus's past performance "as nothing more than 'isolated incidents,'" and based its decision to decrease Fluor's past performance rating to "Satisfactory Confidence largely on "an isolated incident beyond Fluor's control: a November 12, 2016 suicide attack at Bagram Airfield ('Bagram') that tragically took the lives of five Americans." *Id.* at 18–19. Had the Agency evaluated offerors' past performance equally, plaintiff claims the Agency would have given all three offerors the same rating of either "Substantial Confidence" or "Satisfactory Confidence." *Id.* at 19.

In response, defendant argues that the Agency reasonably found Fluor's "past performance record regarding compliance with security requirements to be of concern," as there were several security-related incidents "indicative of a trend in [Fluor's] ability to consistently comply with security requirements." Def.'s CMJAR at 26–27. Among those concerns was Fluor's "unauthorized movement of a container that was being used to conceal theater level assets, [] an incident where subcontractor employees attempted to enter base dining facilities at Bagram with expired Letters of Authorization," and, most significantly, the Bagram suicide bombing. *Id.* at 26 (citations omitted). Defendant explains that the Agency's concerns deepened

when, shortly after the Bagram bombing, a Fluor employee "was found sleeping when he was supposed to be escorting local national employees." *Id.* at 27.  This final incident caused Fluor to receive a Level III Non-Conformance Report ("NCR").  *Id.*  Moreover, KBR contends that "Fluor's effort to negate the weight of [the Bagram] incident by citing examples of positive past performance" fails because the Solicitation warned offerors that a "negative finding in any element" of an offeror's Past Performance volume "may result in an overall lower confidence assessment rating."  KBR's CMJAR at 28 (quoting AR 2628).

Where a protestor contests an agency's past performance evaluation in a negotiated procurement, "a protestor must overcome a 'triple whammy of deference by demonstrating by a preponderance of the evidence that the SSA lacked any rational basis' to assign a given past performance rating."  *Am. Auto Logistics, LP v. United States*, 117 Fed. Cl. 137, 186 (2014) (emphasis omitted) (quoting *Overstreet Elec. Co., Inc. v. United States*, 59 Fed. Cl. 99, 117 (2003)).  As such, the Court's review is "limited to determining whether the evaluation was reasonable, consistent with stated evaluation criteria[,] and complied with relevant statutory and regulatory requirements."  *Westech Int'l, Inc. v. United States*, 79 Fed. Cl. 272, 293 (2007).  A past performance evaluation is reasonable when the Agency gave "meaningful consideration" to any possible adverse past performance information documented in the offeror's record.  *See Vanguard Recovery v. United States*, 99 Fed. Cl. 81, 95–96 (2011).  Even if "the agency's interpretation of the facts giving rise to the perception of substandard prior performance is disputed by the contractor, the agency's evaluation will not be overturned as long as it is reasonable."  *SDS Int'l v. United States*, 48 Fed. Cl. 742, 756 (2001).

The Court finds plaintiff's past performance arguments unavailing.  The Solicitation states that an offeror will receive a "Satisfactory Confidence" rating when "the Government has a reasonable expectation that the Offeror will successfully perform the required effort" based on the offeror's "recent/relevant performance record."  AR 2628.  Based on the record, which includes the Agency's thorough evaluation and consideration of various security concerns regarding Fluor's Past Performance volume, the Court concludes that the Agency's assignment of a Satisfactory rating was neither arbitrary nor capricious.  *See* AR 68928, 68937, 68956.

The Solicitation also explicitly notified offerors that a "problem/problem resolution . . . in any element may become an important consideration in the assessment process," and that a "negative finding in any element may result in an overall lower confidence assessment rating."  AR 2628.  Thus, even if the Bagram suicide bombing weighed heavily in the Agency's Past Performance evaluation, the Court cannot conclude such a decision was unreasonable.  *See SDS Int'l*, 48 Fed. Cl. at 756.  Considered collectively, the Court believes plaintiff's arguments amount to mere disagreements with the Agency's evaluation decisions, which, as this Court has previously held, fails to demonstrate that the decisions were unreasonable.  *See Sci. & Mgmt. Res. v. United States*, 117 Fed. Cl. 54, 65–66 (2014).

In addition to arguing that the Agency unreasonably evaluated its own Past Performance volume, plaintiff alleges the Agency "adopted a far more lenient attitude toward KBR[] and Vectrus'[s] comparable (indeed, even more adverse) past performance information than it applied to Fluor" in assigning both Substantial Confidence ratings.  Pl.'s MJAR at 24. Specifically, plaintiff points out that KBR received two Level III critical NCRs, a recent overall

"Marginal" rating on its LOGCAP IV Task Order 7, and various "safety infractions" under another contract.  *Id.*  Plaintiff also highlights Vectrus's three Level III NCRs, the first of which reflected intentional bad acts in a pest management-related contract, and the second of which resulted from Vectrus's subcontractor being "debarred for intentionally inflating commissions." *Id.* at 27.  Moreover, plaintiff argues that the Past Performance Evaluation Team's ("PPET") acceptance of Vectrus's response explaining its third Level III NCR and initial "Marginal" Contractor Performance Assessment Report ("CPAR") rating evidences disparate treatment, as the PPET set aside the systemic nature of the violations in its evaluation based on Vectrus's "*beliefs*."  *Id.* at 28–29 (emphasis in original).

In response, defendant asserts that the Agency did not dismiss KBR's issues, as the Agency thoroughly documented and evaluated what occurred.  *See* Def.'s CMJAR at 27–28. This includes the Agency's determination that KBR's corrective action plans adequately resolved each issue, which, defendant states, were qualitatively different than the issues in Fluor's past performance record.  *Id.* at 28.  Additionally, KBR argues that the Agency applied equal evaluation standards in concluding that Fluor's past performance concerns "extended across multiple Reference contracts," whereas both of KBR Level III NCRs "stemmed from unrelated issues on the same contract."  KBR's CMJAR at 35–36.  Moreover, the Agency addressed both Level II NCRs "in a 19-page EN response that was effectively incorporated in full into the PPET's assessment of KBR's performance."  *Id.* at 36 (citations omitted).

The record supports defendant and KBR's contentions and confirms that the Agency's evaluation of KBR's past performance record was "reasonable, consistent with stated evaluation criteria[,] and complied with relevant statutory and regulatory requirements."  *See Westech Int'l, Inc.*, 79 Fed. Cl. at 293; *see also* AR 68828–29, 68869.  Furthermore, the record demonstrates that that the Agency did not disparately evaluate Fluor and KBR's respective past performance, and that the Agency gave "meaningful consideration" to the adverse past performance information documented in each offeror's record.  *See Vanguard Recovery*, 99 Fed. Cl. at 95–96.

Regarding the Agency's evaluation of Vectrus's Past Performance volume, defendant reiterates its argument that the Agency thoroughly documented what occurred and reasonably evaluated the information included therein.  Def.'s CMJAR at 29.  First, defendant claims the Agency knew of and considered the subcontractor issue, and ultimately accepted Vectrus's Corrective Action Plan.  *Id.*  Additionally, defendant contends that the PPET "carefully reviewed" the pest management-related contract to conclude the issue was not systemic in nature, as it resulted from "failures in supervision" that Vectrus remedied by terminating the Supervisor.  *Id.* at 29–30 (quoting AR 69177).

This Court has routinely held that "a contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 383 (2003); *see also, e.g.*, *Constellation W. v. United States*, 125 Fed. Cl. 505, 553 (2015).  "Equal treatment, however, does not require that all proposals be treated the same."  *Chenega Mgmt., LLC v. United States*, 96 Fed. Cl. 556, 585 (2010) (citing 48 C.F.R. § 1.102-2(c)(3), which states that "[a]ll contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same.")).

The Court agrees with defendant as to the Agency's assessment of Vectrus's two initial NCR-related issues. With regard to the third, the record reveals that Fluor's "systemic issues" dealt with safety concerns, whereas Vectrus's "systemic issues" concerned operational management difficulties. *Compare, e.g.*, AR 68955–56, *with* AR 69193–94. While there is some evidence that the Agency treated the "systemic issues" in a discrete area of Vectrus and Fluor's respective past performance records and corrective action plans differently, any suggestion of unequal treatment is clearly negated by the Agency's thorough evaluation of each offeror's *entire* past performance record. *See, e.g.*, GAO Advisory Opinion at 32–33 (providing a high-level summary and overview of each offeror's CPAR record); *compare* AR 69193–94, *with* AR 68921–22. Additionally, the offerors' "systemic issues" were of two inherently different breeds. *See Constellation W.*, 125 Fed. Cl. at 553 (explaining that an agency action is arbitrary "when the agency offered insufficient reasons for treating similar situations differently.") (quoting *Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 234 (1997)). Thus, based on the Court's review of the Administrative Record, and as "[s]ecurity requirements are essential for the LOGCAP V contract due to the dangerous contingency environments a LOGCAP V contractor is expected to operate in," the Court finds no basis upon which to overturn the Agency's Past Performance ratings or conclude that the Agency disparately evaluated offerors' Past Performance volumes. *See* AR 68956.

### D.   Cost Realism

Plaintiff also argues that the Agency failed to conduct a meaningful cost realism evaluation of Vectrus's CENTCOM proposal. *See generally* Pl.'s MJAR at 32–37. In support of this argument, plaintiff points to the more than $350 million delta between Vectrus and the next-lowest price offeror, Fluor, and the over $1 billion gap between Vectrus and the highest-priced offeror, DynCorp. *Id.* at 32. Plaintiff argues that, had the Agency properly assessed the realism of Vectrus's total evaluated price for CENTCOM, it would have realized that Vectrus's low price "stemmed not from a more competitively priced proposal, or a more efficient technical approach, but from a flawed submission that rested on bad data." *Id.* In response, defendant states that plaintiff's cost realism arguments amount to "a disagreement with the Army's source selection decision and a misreading of the requirements." Def.'s CMJAR at 37. Additionally, defendant argues that the Technical Management Evaluation Team performed a cross-walk to verify different aspects of each offeror's proposal, and that, as a general matter, plaintiff's argument "ignore[s] the fact that its own total evaluated price is $667M less than DynCorp's price in CENTCOM. By this logic, Fluor's prices too would have been considered unrealistic." *Id.* at 37–38.

This Court will not overturn an agency's cost realism determination "unless the plaintiff demonstrates the absence of a rational basis for the agency's decision." *A-T Solutions, Inc. v. United States*, 122 Fed. Cl. 170, 180 (2015) (citing *CTA Inc. v. United States*, 44 Fed. Cl. 684, 693 (1999)). Pursuant to FAR 15.404-1(d)(1)–(2), which the Agency incorporated by reference into the Solicitation, an agency must perform a cost realism analysis on cost-reimbursement contracts to independently review and evaluate "specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal."

An agency has broad discretion regarding the "nature and extent" of the cost realism analysis it performs, "unless the agency commits itself to a particular methodology in a solicitation." *Mission1st Grp., Inc. v. United States*, 144 Fed. Cl. 200, 211 (2019) (quoting *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 358 (2009)); *see also Agile Def., Inc. v. United States*, 143 Fed. Cl. 10, 18 (2019). Here, the Solicitation stated that the Agency would evaluate the realism of offerors' cost reimbursable efforts in accordance with FAR 15.404-1(d). AR 2629.

Plaintiff points to three discrete examples concerning Vectrus's Fire and Emergency Services and its Program Management Hours to illustrate the alleged absence of a cost realism analysis. *See* Pl.'s MJAR at 33–35. First, plaintiff claims that Vectrus inexplicably proposed the same number of annual hours dedicated to program management support for SOUTHCOM as it did for CENTCOM—a significantly larger contract—and that this "vast difference" should have alerted the Agency to a possible cost realism issue. *Id.* at 33–34. Plaintiff further contends that Vectrus was the only offeror that "did not identify all its hours for Program Management Offices ('PMO'), Procurement and Supply Management ('PSM'), and Operational Support Offices ('OSO')," and that instead, "Vectrus characterized certain program management support as an 'Other Direct Cost' ('ODC'), which it calculated using an 'IDIQ PMO Allocation' rate." *Id.* at 33. As such, plaintiff argues that the Agency "never analyzed these costs for realism because they were not included as proposed staffing hours in Vectrus'[s] Technical/Management volume." *Id.*

Defendant responds by alleging that plaintiff "only utilizes the [Full Time Equivalents ("FTEs")] allocated from the IDIQ portion of Vectrus's proposal and ignores significant direct PMO hours included in Vectrus's CENTCOM task order proposal." Def.'s CMJAR at 41. Though Vectrus "utilized a different approach," defendant contends that the hours comport with Vectrus's technical approach and were "very similar" to Fluor's proposed number of hours. *Id.* Additionally, defendant argues that the Solicitation did not require offerors to delineate between its hours for PMO, PSM, or OSO, and that offerors could shift resources from the PMO to the OSO as needs arise, as these services "are by definition interrelated." *Id.* at 41–42. Thus, defendant alleges, Vectrus's proposed hours for services in CENTCOM and SOUTHCOM are "vastly different." *Id.* at 42. Based on the underlying record that explicitly addresses Vectrus's unique approach, the Court cannot conclude that the Agency erred in evaluating this component of Vectrus's proposal. *See* AR 2614, 2782, 3810–16, 68571–78, 101368; *see also* Def.'s CMJAR at 42 (summarizing Fluor and Vectrus's proposed hours in CENTCOM and SOUTHCOM as extracted from AR Tabs 87-1, 88-1, 89-1, 93-1); *see generally* AR 3797–830.

Next, plaintiff contends the Agency "failed to detect that Vectrus'[s] proposed costs for Emergency Dispatchers under PWS 04.12.03 did not match the staffing assumptions from its LSM," and that the 8,760 hours Vectrus identified in its LSM per year for Emergency Dispatchers are not included in Vectrus's Cost/Price proposal for CENTCOM Kuwait. Pl.'s MJAR at 35. In response, defendant explains that Vectrus intentionally did not list its proposed costs for that site in its Kuwait cost proposal, as those hours and costs are properly captured in the region in which they apply, which is Qatar. Def.'s CMJAR at 40–41. Vectrus additionally reasons that, had plaintiff reviewed the correct proposal volume, "it would have found all 8,760 annual hours and their associated costs in the proper proposals based on each region. Vectrus's

CMJAR at 33.  The Court's review of the record confirms the validity of defendant and Vectrus's arguments on this issue, and therefore plaintiff's arguments lack merit.  *See generally* AR 55251–693, 63592–4004, 64012–419.

Finally, plaintiff argues that, in order to comply with a Department of Defense Instruction ("DoDI") and meet the requirements of PWS § 4.12 (Fire and Emergency Services), every offeror proposed using four firefighters per vehicle, and that only Vectrus did not include the entire corresponding costs in its Cost/Price proposals.  *Id.* at 33.  Instead, plaintiff alleges that "Vectrus included the costs for only two firefighters per vehicle [in certain instances], shaving millions of dollars off its proposed costs while purporting to meet PWS requirements," which went unchecked because the Agency "assumed" those costs were included in Vectrus's Cost/Price proposal.  *Id.*  In response, defendant contends that not only did Vectrus understand the requirements, but that Vectrus's unique approach actually resulted in a quantity of firefighter hours that exceeded the requirements.  Def.'s CMJAR at 40.  Moreover, defendant suggests that "[e]ven assuming that Vectrus's firefighter costs were half of what should have been, the $352 million gap between Vectrus and Fluor would only be reduced by [] $31 million, still leaving the difference between Vectrus and Fluor at more than $300 million."  *Id.* at 39–40.  Vectrus additionally argues that its technical and cost proposals accurately reflect its approach, and that they comport with "the actual on-scene response requirements [of] a minimum of four firefighters in one engine company, not (as Fluor claims) a minimum of four firefighters for every vehicle."  Vectrus's CMJAR at 29; Vectrus's Reply at 7.

The record before the Court does not indicate that the Agency failed to perform a cost realism analysis in accordance with FAR 15.404-1(d), or that the Agency made "critical miscalculations" in conducting its evaluations.  *See Univ. Research Co., LLC v. United States*, 65 Fed. Cl. 500, 509 (2005).  First, the DoDI provides that "[a] minimum of a single engine company consisting of four personnel is required on-scene," a requirement Vectrus clearly satisfied in its LSM.  AR 55635, 126457.  Though the Agency did not appear to assess the realism of every single labor rate and number, the Agency repeatedly expressed in its "Final Cost/Price Evaluation Report" for each COCOM that it "evaluated cost realism via [each] Offeror's supporting data provided on a sampling basis" and considered that data to be realistic.  *E.g.*, AR 69778.  In addition to those evaluations, the Agency provided a variation of the following rationale at the conclusion of its in-depth evaluations for each of the countries in Vectrus's CENTCOM Cost/Price volume:

> The Technical/Management team confirmed that the technical aspects of the proposal are realistic for the work to be performed and reflect a clear understanding of the requirements.  A crosswalk of the proposed hours in the [LSM] to the hours in the cost/price proposal was performed on the cost reimbursement effort to ensure the cost volume reflects the unique methods of performance described in the offeror's technical proposal.  Based on the findings, no probable cost adjustments are required for the technical aspects of the proposal.  (Note the Technical/Management review and crosswalk included prime and subcontracted direct labor.)

AR 69779; *see also* AR 69784, 69792, 69796, 69804–05, 69809.  Thus, even if the Agency neglected to identify a discrete, isolated discrepancy, the Court cannot conclude that the Agency's entire cost realism evaluation was flawed given the extent to which the Agency performed proper cost realism analyses in accordance with FAR 15.404-1(d)(1).  Moreover, "an agency's cost realism analysis does not have to be performed with 'impeccable rigor' in order to be rational" provided the analysis "reflect[s] that the agency took into account the information available and did not make 'irrational assumptions or critical miscalculations.'"  *E.g.*, *Univ. Research Co., LLC*, 65 Fed. Cl. at 509 (quoting *OMV Med., Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000)).  Accordingly, the Court concludes that the Agency rationally conducted its cost realism analyses.  *See A-T Solutions, Inc.*, 122 Fed. Cl. at 180.

### E.  Price Reasonableness

In its final argument, plaintiff alleges that the Agency failed to conduct a price reasonableness evaluation that comported with the Solicitation's requirements.  Pl.'s MJAR at 29–30.  Specifically, plaintiff claims that the Agency did not perform a price reasonableness analysis of the FFP CLINS in the EUCOM region, and that the Agency improperly conflated the required price reasonableness analysis with its cost realism analysis.  *Id.*  The Court sustains this final protest ground for the reasons set forth below.

The Solicitation provided the following:

> To be considered for award, the total proposed [CPFF] for the [CPFF] CLINs (including any [Most Probable Costs] pursuant to (iv)(b) above[]), and the total proposed price for the [FFP] CLINS *must separately be found reasonable.*  A determination that *either one is unreasonable* will render the offeror ineligible for an award in that [COCOM] or Afghanistan.  Each [COCOM] and Afghanistan will be considered independently.  A determination that the pricing of one [COCOM] or Afghanistan is unreasonable does not by itself render the offeror ineligible for consideration under another [COCOM] or Afghanistan.

AR 2630 (emphases added).  Plaintiff argues that, by failing to separately find the CPFF and FFP CLINs reasonable, the CO directly contravened the stated Solicitation requirements, thereby rendering the Agency's award of the EUCOM region to KBR arbitrary and capricious.  Pl.'s MJAR at 29–30.  Plaintiff asserts that the CO admitted to this error when she stated the following: "due to the inherent link of the [FFP] effort, Setting the Theater, which was also the guaranteed minimum obligation for each contract award, *the cost-reimbursable efforts were considered with the [FFP] efforts*."  *Id.* at 30 (quoting AR 73825–26) (emphasis added).  According to plaintiff, the Agency compounded this error by evaluating only the proposed prices of the lowest bidder and not those of the actual awardee.  *Id.* at 31.  Specifically, plaintiff contends that the Agency's Cost-Price Evaluation Report ("CPER") for KBR's EUCOM Cost/Price volume fails to analyze the reasonableness of KBR's proposed FFP CLIN pricing.  *Id.*  Plaintiff further suggests that the absence of any price analysis is particularly concerning as "KBR's proposed price of $20.5 million for the EUCOM FFP CLINs was 1,508.79% higher than the lowest bidder's proposed price of $1.27 million," and the Solicitation states that an offeror is ineligible for award if its FFP CLINs are found unreasonable.  *Id.*

In its Response, defendant argues that plaintiff "misconstrues the solicitation requirements," and that the Agency "conducted an extensive analysis of each offeror's [TEP] for each task order." Def.'s CMJAR at 31. Defendant cites to paragraph L.10.2.(c) of the Solicitation for support, which states that, for FFP CLINs, "a cost or price breakout and supporting documentation is not required to be submitted with the proposal." *Id.* at 32 (quoting AR 2622). Defendant further argues that, as the Agency "did not intend to review any components" of the FFP effort, plaintiff's argument that the Agency "should have analyzed separately the components of each offeror's FFP items, or the delta between offerors, [] is [] an untimely protest of the terms of the solicitation." *Id.* at 32–33 (citing *Blue & Gold Fleet, LP v. United States*, 492 F.3d 1308, 1313–15 (Fed. Cir. 2007)).[5] Defendant also alleges that the Agency's combined price reasonableness evaluation was appropriate, as "[s]eparate reasonableness determinations for the [FFP] and [CPFF] efforts would have been inconsistent with the nature of the requirements due to the inherent link of the [FFP] and cost-reimbursable efforts." *Id.* at 33.

Additionally, defendant argues that the Agency conducted its price reasonableness evaluation in accordance with FAR 15.404-1(b)(2)(i). *Id.* at 31. In support, KBR refers the Court to a declaration made by the CO during the pendency of Fluor's GAO protest, in which the CO provided explanations that supplemented the Agency's prior price reasonableness evaluation and value analysis pursuant to FAR 15.404-1(b)(4). KBR's CMJAR at 43–44. KBR contends that while "the cost/price evaluator relied exclusively on [the aforementioned price analysis] techniques to find the lowest-priced offeror reasonable, the CO subsequently used these techniques, in conjunction with the value analysis, to find KBR's FFP in EUCOM reasonable." *Id.* at 43–45 (citation omitted).

As an initial matter, the Court notes that the CO's declaration holds no weight, as it was created during the heat of litigation while this matter was pending before the GAO and was therefore not contemporaneously created with the CO's price evaluation. *See generally* AR 126467–69. The Court will not rely on a party's post hoc rationalizations, especially when a document such as the CO's declaration did not yet exist when the Agency conducted price reasonableness evaluations and made award determinations; such a document serves only to provide after-the-fact explanations. *See Arch Chems., Inc. v. United States*, 64 Fed. Cl. 380, 388 (2005). Instead, the Court must review the record in existence at the time of the award decision when assessing the parties' price reasonableness arguments. *Pinnacle Sols., Inc. v. United States*, 137 Fed. Cl. 118, 131 (2018) (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).

The Solicitation stated that the "Government will evaluate the realism of the offerors [sic] proposed cost for the cost reimbursable effort through cost realism analysis. The Government will evaluate price reasonableness for the fixed priced effort." AR 2629 (citations omitted). For the CPFF CLINs, the Agency had to evaluate "[t]he Offerors [sic] proposed costs . . . for

---

[5]     The Court believes defendant mischaracterizes plaintiff's argument by suggesting that it presupposes pre-award protest grounds of the Solicitation's terms, which, if true, would be barred under *Blue & Gold*, 492 F.3d 1308. Accordingly, the Court declines to fully address this argument.

reasonableness and realism." *Id.* For FFP CLINs, "[t]he proposed price [would] be evaluated for reasonableness using price analysis techniques." AR 2630. Though the Solicitation directed the Agency to determine a TEP "for each [COCOM] and Afghanistan award determination[] . . . by adding together the offerors['] proposed [CPFF] for the cost reimbursable efforts," inclusive of "any cost adjustments necessary based upon the cost realism analysis," AR 2629, it also stated the following:

> *To be considered for award*, the total proposed [CPFF] for the [CPFF] CLINs (including any [Most Probable Costs] pursuant to (iv)(b) above[]), and the total proposed price for the [FFP] CLIN[s] *must separately be found reasonable*. A determination that *either one is unreasonable* will render the offeror ineligible for an award in that [COCOM] or Afghanistan. Each [COCOM] and Afghanistan will be considered independently.

AR 2630 (emphases added). Interpreting the Solicitation in a manner that "harmonizes and gives reasonable meaning to all of its provisions," the Court concludes that the Agency had to separately evaluate each offeror's CPFF and FFP CLINs for reasonableness to determine whether each offeror would be "considered for award." *See id.*; *see also Banknote Corp.*, 365 F.3d at 1353. The Court's interpretation is further bolstered by the language of the SSDD, which states, for example, the following: "The offeror receiving the EUCOM award is not eligible to receive the PACOM task order awards. Of the *remaining eligible offerors*, the Government will make an award . . . to the responsible Offeror determined to provide the best value." AR 70613 (emphasis added). Read together, the Agency clearly "considered for award" all "remaining eligible offerors" when determining each COCOM awardee, and therefore had to evaluate each of those offeror's price proposals for reasonableness. *See* AR 2630, 70613.

The Agency chose to use FAR Part 15 evaluation methods for analyzing price reasonableness in this procurement. AR 2629. As a general matter, "[t]he contracting officer is responsible for evaluating the reasonableness of the offered prices." 48 C.F.R. § 15.404-1(a)(1). The record demonstrates that, contrary to the requirements of the Solicitation, the CO did not conduct a separate price reasonableness evaluation of KBR's FFP and CPFF CLINs in the EUCOM region, and that this failure also extends, at minimum, to the CO's evaluation of the PACOM region. *See* AR 2630, 73825–26, 73829–30.[6] As plaintiff correctly pointed out, the following statement made by the CO in her April 9, 2019 Fair and Reasonable Price Determination underscores the Agency's critical error:

> Also, due to the inherent link of the [FFP] effort, Setting the Theater, which was also the guaranteed minimum obligation for each contract award, the cost-reimbursable efforts were considered with the [FFP] efforts. The awards for both the Setting the Theater and Performance Task Orders are inseparable for all award decisions with the exception of Afghanistan, which did not have an associated Setting the Theater Task Order.

---

[6]     The Administrative Record does not include the Contracting Officer's "Fair and Reasonable Price Determination" for the AFRICOM and SOUTHCOM regions.

*Id.*  The record further reveals that the Agency did not conduct a proper price reasonableness evaluation in accordance with FAR 15.404-1(b).  *See generally id.*  FAR 15.404-1(b) gives agencies the discretion to use various price analysis techniques and procedures to determine price reasonableness, with the "preferred techniques" being the comparison of offerors' proposed prices against each other or to the historical prices paid for similar items.  48 C.F.R. § 15.404-1(b)(2)(i)–(ii), (b)(3).  If an agency compares offerors' prices, adequate price competition[7] can establish that the price is fair and reasonable.  § 15.404-1(b)(2)(i).  Where an agency implements a value analysis, however, FAR 15.404-1(b)(4) states the following: "[v]alue analysis can give insight into the relative worth of a product and the Government may use it *in conjunction with* the price analysis techniques listed in paragraph (b)(2) of this section." (emphasis added).

The record contains several memoranda in which the Cost/Price Factor Chair found each awardee's prices to be reasonable based on "adequate price competition," and a determination that the offeror with the *lowest* TEP, FFP CLINs, and CPFF CLINs was considered fair and reasonable.  *See generally* AR 69874–95.  To support this finding, the Cost/Price Factor Chair listed offerors in ascending order of price based on each offeror's TEP, total FFP costs, and total CPFF costs in each COCOM, stated that the lowest price is fair and reasonable based on adequate price competition, and compared the lowest price to the next-lowest price.  *See generally id.*  The Court finds the Agency's decision to evaluate only the lowest priced offeror for reasonableness at this stage of the procurement problematic, particularly as only one of the COCOM awardees was the lowest priced offeror.  *See* AR 73823–24, 70615, 70620, 70623, 70626, 70630–31, 70677; *see also* AR 73825–26, 73829–30.  Moreover, the CO failed to subsequently remedy this deficiency in her Fair and Reasonable Price Determinations.  Thus, no discernable, meaningful analysis exists to demonstrate how, despite the wide range in proposed prices, each awardee's price was fair and reasonable.  *See Serco Inc. v. United States*, 81 Fed. Cl. 463, 494 (2008) ("After all, it is not competition for competition's sake, but the favorable comparison of a given offeror's price to those of the other contestants, that provides the necessary assurance that a given price is 'fair and reasonable.'").

The next phase of the Agency's review proved equally problematic.  The CO seemingly attempted to complete her price reasonableness analysis by documenting the percentage difference between each offeror and the "difference from low" and "difference from next low" without any further explanation.  *See generally* AR 73823–32.  The Court finds that such a bare comparison of percentage differentials in price, without any further analysis, is inadequate for purposes of conducting a meaningful price reasonableness evaluation, particularly as it concerns the price reasonableness of each COCOM awardee's proposed prices.  *See Technatomy Corp. v. United States*, 144 Fed. Cl. 388, 390 (2019) ("[The agency] conducted a meaningful price

---

[7]     FAR 15.403-1(c)(1) states that "[a] price is based on adequate price competition when:

(A) Two or more responsible offerors, competing independently, submit priced offers that satisfy the Government's expressed requirement;
(B) Award will be made to the offeror whose proposal represents the best value (see 2.101) where price is a substantial factor in source selection; and
(3) There is no finding that the price of the otherwise successful offeror is unreasonable."

reasonableness analysis, in compliance with 48 C.F.R. § 15.404-1(b)(2), by comparing the prices of offerors to each other's, to the average price, to the independent government cost estimate, and to the prices under other contracts, *and by explaining that variations were due to differing risk preferences and technical approaches*." (emphasis added)); *see also, e.g.*, AR 73829. The CO included a variation of the following in her Fair and Reasonable Price Determination for each of the COCOMs, further documenting the flawed nature of the Agency's best value analysis:

> The Cost/Price Factor Chair evaluated price reasonableness for the LOGCAP V EUCOM award decision. This evaluation resulted in a determination that Vectrus Systems Corporation's total evaluated price is fair and reasonable based on competition. The Cost/Price Factor Chair also stated that other offerors may be able to be determined fair and reasonable based on a tradeoff with non-price factors. The value derived from the non-price factors renders the value of the cost-reimbursable prices for the performance task orders reasonable for the identified best value award decisions in accordance with FAR 15.404-1(c) and (d).

AR 73825; *see also* AR 73829. This statement demonstrates that the CO heavily relied on the Cost/Price Factor Chair's incomplete and non-contemporaneous price reasonableness determinations in completing her value analysis. Such a reliance directly violates FAR 15.404-1(b)(4), which requires that the CO conduct a value analysis "in conjunction with" the selected price analysis technique. *Id.* Thus, the Court finds that, by failing to examine adequate price competition concurrently with the value analysis, the CO fell short of fulfilling the requirements under FAR 15.404-1(b)(4). Accordingly, the Court sustains plaintiff's price reasonableness protest grounds.

### F.  Prejudice

As a final backstop, defendant claims that, even if the Agency conducted a flawed price reasonableness evaluation, plaintiff cannot demonstrate prejudice. Def.'s CMJAR at 31. Alternatively, defendant argues that, even if the Agency had conducted separate price reasonableness analyses, the Agency would have found KBR's FFP CLINs to be reasonable as there was adequate price competition and KBR's proposal "fell near the middle of the proposals." *Id.* at 34. Moreover, as KBR is the incumbent for this region, defendant contends that there was nothing in the record that would lead the Agency to conclude that KBR's FFP proposal was unreasonably high and warranted elimination from consideration for award. *Id.* at 34. Defendant separately asserts that plaintiff cannot demonstrate prejudice because the Agency could waive compliance with a material solicitation requirement where "the award will meet the agency's actual needs without prejudice to other offerors." *Id.* at 34–35. Finally, defendant argues that because plaintiff did not claim it would have "changed its proposal to its competitive advantage had it known the Army would effectively waive or relax" the price reasonableness requirement, either KBR would have still received the EUCOM award, or, had the Agency found KBR's prices to be unreasonable, the Agency would have reopened discussions with KBR who, in turn, would have lowered its prices. *Id.* at 35–36.

27

In its Response and Reply, Plaintiff advances two key arguments to demonstrate prejudice.  Pl.'s Resp. at 11–12.  "First, as the FFP CLINS are the only guaranteed CLINS in the IDIQ contract at issue, the Agency's failure to conduct a separate price reasonableness analysis means it failed to analyze the CLINS that constitute 100% of the contract's guaranteed value." *Id.* at 11.  Alternatively, plaintiff posits that, if the Agency had found KBR's proposed price for the FFP CLIN to be unreasonable based on the 1,508.79% delta, "KBR would have been ineligible for award and Fluor, which submitted the strongest Technical/Management proposal of any offeror, and had a lower TEP than KBR, would have had a substantial chance of winning the IDIQ contract associated with the EUCOM task order."  *Id.* at 12.

This Court has explained that the "procedures called for in the RFP are binding 'regardless of [the agency's] view of the appropriateness of the standard.'" *Afghan Am.*, 90 Fed. Cl. at 359 (citing *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting *Alfa Laval Separation, Inc. v. United States*, 40 Fed. Cl. 215, 232 (1998))). When an agency decides to abandon or waive a solicitation requirement, it must advise all offerors of that decision and "provide a 'coherent and reasonable' explanation of why its decision was rational."  *Naplesyacht.com, Inc. v. United States*, 60 Fed. Cl. 459, 472 (2004). Nothing in the record suggests that the Agency intended to waive the Solicitation's price reasonableness requirements, particularly where the Agency did not advise or provide an explanation to offerors of its desire to waive the requirement until this litigation.  *See id.*; *see also* Def.'s CMJAR at 34–35.  Rather, as the Court discussed above, the record demonstrates that the Agency chose not to comply with the requirement and instead conducted irrational price reasonableness evaluations based on a newly devised evaluation method.  Accordingly, the Court finds no merit to defendant's waiver argument.

As the Court has determined that the Agency failed to properly conduct a price reasonableness determination in accordance with both FAR 15.404-1 and the terms of the Solicitation, the Court next must determine whether such a violation prejudices the plaintiff.  In determining whether prejudice exists, the Court applies a different test depending on whether the procurement violated a regulation or the Agency arbitrarily and capriciously violated the terms of the Solicitation.  *See Caddell Constr. Co. v. United States*, 125 Fed. Cl. 30, 50 (2016).  Here, the Court looks to both tests as the Agency violated both the terms of the Solicitation and procurement regulations.

In a bid protest, this Court has previously held that "when an irrational or arbitrary and capricious agency action has occurred, prejudice is presumed, but when a violation of statute or regulation has occurred, there must be a separate showing of prejudice." *Caddell Constr. Co.*, 125 Fed. Cl. at 50 (citing *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)).  As the Court has already determined that the Agency's failure to conduct the price reasonableness evaluation required by the Solicitation was arbitrary and capricious, prejudice is presumed for that argument.  *See id.*; *see also Textron, Inc.*, 74 Fed. Cl. at 283–84 ("If the court finds that the Government has acted arbitrarily and capriciously, the analysis stops at that finding.  There should be no need to continue to prejudice, because a finding that the Government acted arbitrarily and capriciously necessarily invalidates the procurement.").

When a "violation of statute or regulation has occurred, there must be a separate showing of prejudice." *Caddell Constr. Co.*, 125 Fed. Cl. at 50 (citing *Centech Grp.*, 554 F.3d at 1037). In *Textron*, this Court explained that, "[s]ince 1990, the substantial-chance requirement has been construed as requiring everything from a greater than insubstantial chance of success on the merits, to a reasonable likelihood of receiving the award but for the alleged error, to allowing only protest by the second lowest bidder." 74 Fed. Cl. at 283–84 (citations omitted). Since *Textron* was issued, the inconsistent application of the "substantial chance" standard has yet to be remedied. While the Court will not attempt to remedy it now, based on the nature of the violation in this case, the Court employs a suggestion made in *Textron*, which states that "the prejudice analysis should not focus on whether the protestor had a 'substantial chance' of receiving the award because it had a fully compliant proposal, but, rather, whether the procurement violation was significant to the protestor's chance of being awarded the contract." 74 Fed. Cl. at 329.

Here, the Agency's failure to conduct an adequate price reasonableness evaluation and a proper value analysis in accordance with FAR 15.404-1(b) and FAR 15.404-1(b)(4), respectively, was necessarily "significant to the protestor's chance of being awarded the contract" given that the Agency based its award decisions on those flawed analyses. *See id.* While the Court finds that the Agency did not perform a price reasonableness analysis in accordance with FAR 15.404-1, even if the Court was to accept defendant's argument that the Agency conducted price reasonableness evaluations, such flawed evaluations were only conducted for the lowest priced offeror in each COCOM. *See* AR 73823–24, 70615, 70620, 70623, 70626, 70630–31, 70677; *see also* AR 73825–26, 73829–30. This failure directly affects plaintiff's chance of being awarded certain contracts given the Agency's sequential award scheme and failure to conduct a complete price reasonableness determination for the awardee in several COCOM regions. AR 2624–25. While the Court will not speculate as to the outcome of such an analysis, that failure alone means that the Agency could have made different award decisions pending the completion of price reasonableness analyses and proper value analysis conclusions. Such Agency action—or more accurately, inaction—was clearly "significant to the protestor's chance of being awarded the contract." *See Textron*, 74 Fed. Cl. at 329. As such, plaintiff has undoubtedly demonstrated that it was prejudiced by the Agency's violations of FAR 15.404-1(b).

## IV.        Conclusion

For the reasons set forth above, plaintiff has demonstrated success on the merits. Consistent with discussions held during the December 3, 2019 Status Conference, the Army filed a status report on December 9, 2019, notifying the Court of its intent to take corrective action with respect to the Army's price reasonableness determinations. *See generally* Defendant's Status Report Regarding Corrective Action and Motion to Stay Proceedings, ECF No. 45. On December 17, 2019, the Court issued an Order staying and remanding the case to the Agency for a period of forty-five days—up to and including January 31, 2020—for the Agency to conduct corrective action. Order Remanding Case to Army, ECF No. 46. In that Order, the Court also directed the defendant to file a status report on or before February 7, 2020, "apprising this Court of the results of the Agency's corrective action and providing the Court with the Agency's new price reasonableness determinations." *Id.* at 2. In turn, the Court afforded the plaintiff seven

days—up to and including February 14, 2020—to respond to defendant's Status Report.  *Id.* at 2.  As such, the Court need not address the parties' injunctive relief arguments.  On February 5, 2020, defendant filed a status report regarding that corrective action, along with over 1,000 pages of supporting documentation.  *See* Defendant's Status Report Regarding Corrective Action, ECF No. 50; *see also* Associated Documents, ECF No. 51.  Though plaintiff was given the opportunity to respond to defendant's Status Report, it elected not to do so.  Upon careful review of defendant's Status Report and supporting documentation, the Court finds that, through corrective action, the Agency adequately evaluated price reasonableness in accordance with both the Solicitation and the FAR.  As corrective action is now complete, the Court issues this Opinion.

For the reasons set forth above, defendant's MOTION to dismiss is **GRANTED-IN-PART**, with respect to the Afghanistan task order, and **DENIED-IN-PART** as to all other arguments.  Defendant and defendant-intervenor's CROSS-MOTIONS for Judgment on the Administrative Record are **GRANTED-IN-PART** and **DENIED-IN-PART**.  Plaintiff's MOTION for Judgment on the Administrative Record is **GRANTED-IN-PART**, with respect to its price reasonableness arguments only, and **DENIED-IN-PART** with respect to all other issues.  However, as the Agency adequately evaluated price reasonableness during the course of corrective action, defendant is now entitled to judgment in its favor.  Accordingly, the Clerk is directed to enter judgment in favor of defendant and defendant-intervenors.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge